Patricia HOLLAND, Plaintiff,

v.

Alae ZARIF, M.D., Susan Anders, Trina Wheedleton, the Department of Labor, State of Delaware, Defendants.

Civ.A. No. 2099–S.

Court of Chancery of Delaware, Sussex County.

Submitted: Dec. 21, 2001.

Decided: Jan. 4, 2002.

David A. Boswell, of Schmittinger and Rodriguez, Rehoboth, for Plaintiff.

C. Cullen Rooney, of Department of Justice, Wilmington, for the Department of Labor, and Defendants Anders and Wheedleton, in their official capacities.

Alan Grant Davis, Milton, for Defendants Anders and Wheedleton, in their individual capacities.

Larry W. Fifer, Lewes, for Defendant Zarif.

## OPINION

STRINE, Vice Chancellor.

In her complaint, plaintiff Mrs. Patricia Holland alleges that she was fired from her employment as an office manager by defendant Dr. Alae Zarif, M.D., because of unfounded accusations by Dr. Zarif's wife that Mrs. Holland had an affair with Dr. Zarif at a Chicago medical conference. Dr. Zarif allegedly terminated Mrs. Holland's employment in order to appease his jealous wife, and Mrs. Holland contends that her firing would not have happened if she were not a woman.

After her termination, Mrs. Holland attempted to file a sex discrimination charge under the Discrimination in Employment and Handicapped Persons Employment Protections Act ("State Discrimination Act" or "Act").[1] According to Mrs. Holland, employees of the Department of Labor refused to allow her to file a charge and gave her no written explanation of the reason for their refusal. Mrs. Holland thereafter brought this action, in which she alleges, among other things, that the defendant Department and two of its employees who are also named as defendants (together, the "Department") abused their discretion and committed an error of law in refusing her charge. Mrs. Holland has also proffered a second amended complaint in which she makes certain common law claims against Dr. Zarif and his wife, proposed defendant Kimberly Zarif.

This opinion addresses the Department's and Dr. Zarif's motions to dismiss the complaint. The basis for their motion is their assertion that the Department has the unreviewable discretion to refuse to

---

1. *Del. C. Ann.*, tit. 19, ch. 7, subch. II (2000).

allow the filing of a discrimination charge (a Departmental "Refusal Decision"). In the alternative, the Department argues that Mrs. Holland has not set forth a cognizable claim of sex discrimination. For his part, Dr. Zarif asserts that if any court has jurisdiction over this matter, it is the Superior Court, and not this one.

In this opinion, I conclude that Mrs. Holland has stated a claim in equity that the Department abused its discretion in its handling of her discrimination claim. The provisions of the Act do not permit the Department to refuse to accept a charge of discrimination; rather, the Department must accept a charge and dismiss it by written decision (a Departmental "Dismissal Decision") if it concludes that a charge is without factual or legal merit. In the circumstances presented, I decline to go on to decide whether Mrs. Holland's complaint states facts that, if true, support a claim of unlawful sex discrimination under the Act. Instead, I intend to give the Department an opportunity to process her charge as it should have in the first instance. This will possibly moot Mrs. Holland's claims against the Department, if it concludes that she has stated a claim that should be submitted to the statutory review board for prosecution. If it concludes otherwise, this approach will provide the court with a written Dismissal Decision, thus providing a more reliable basis for judicial review.

## I. *Factual Background*

Because the structure and text of the Act are so important to the resolution of this motion, I describe them next, and thereafter briefly describe the facts alleged in the complaint.

### A. *The Basic Operation Of The State Discrimination Act*

The heart of the State Discrimination Act is contained in 19 *Del. C.* § 711, which states in pertinent part:

(a) It shall be an unlawful employment practice for an employer to:

(1) Fail or refuse to hire or to discharge any individual or otherwise to discriminate against any individual with respect to compensation, terms, conditions or privileges of employment because of such individual's race, marital status, color, age, religion, sex or national origin.

The Department of Labor of the State of Delaware has administrative responsibility for implementing the State Discrimination Act,[2] which applies to employers who employ four or more persons. The Department of Labor also processes claims of unlawful discrimination under federal law, such as claims under Title VII of the Civil Rights Act of 1964 ("Title VII"),[3] under a work-sharing agreement with the Equal Employment Opportunity Commission. Federal law generally prohibits the same types of discrimination as the State Discrimination Act by employers with fifteen or more employees.[4] As a result, many of the complainants who come to the Department wish to lodge "dual-filed charges,"

---

**2.** More precisely, that responsibility is carried out by the Labor Law Enforcement Office within the Division of Industrial Affairs of the Department of Labor. Hereinafter, I simply refer to the Office as the Department.

**3.** 42 *U.S.C.* § 2000e–5 *et seq.*

**4.** *See Giles v. Family Court of Delaware,* Del. Supr., 411 A.2d 599, 602 (1980) (noting that

"the language of the Delaware statute is substantially the same as the Title VII language defining an unlawful employment practice" and looking to federal guidance to evaluate whether a finding of racial discrimination by the statutory review board under the State Discrimination Act was supported by substantial evidence).

that is, claims under both federal law and the State Discrimination Act.

The statutory process by which discrimination charges are handled under the Act starts with the filing of a charge, as outlined in § 712(b) of Title 19:

> Whenever a charge is filed by . . . a person claiming to be aggrieved . . . alleging that an employer . . . has engaged in an unlawful employment practice, the Department shall serve a copy of the charge on such employer . . . (hereinafter referred to as 'respondent') and shall make an investigation thereof. . . . If the Department determines after such investigation that there is reasonable cause to believe that the charge is not true, it shall dismiss the charge and promptly notify the person claiming to be aggrieved and the respondent of its action. Such notice shall be in writing and shall set forth the facts upon which the decision is based.

In processing claims under Title VII, the Department of Labor is required to accept charges regardless of its own view that the charges do not state a federal discrimination claim. In a Title VII case, even if the Department recommends dismissal of a charge and the EEOC accepts that recommendation, the complainant receives a "right-to-sue" letter informing her of her right to bring a lawsuit to prove her claim of unlawful discrimination.[5] That is, under federal law, a complainant must exhaust her administrative remedies, but thereafter is given access to the courts to press her statutory discrimination claim.

The State Discrimination Act does not contain any similar process by which complainants are given the opportunity to bring a private cause of action in the event the Department dismisses a complaint or, as in this case, refuses to even accept a charge. The General Assembly did not include in the Act the "right-to-sue" process used under Title VII. The Act has been amended since the Title VII process has been in place, but not to create a private right of action for complainants modeled on Title VII. Furthermore, courts interpreting the Act have held that it creates no private right of action independent of the administrative procedures set forth in the Act itself.[6] Other decisions have rejected common law claims premised on discrimination prohibited by the Act, reasoning that the Act created a statutory remedy in derogation of the common law employment-at-will doctrine, and that complainants are stuck with the relief provided for them expressly by the Act.[7]

---

**5.** 42 *U.S.C.* § 2000e–5(f)(1).

**6.** *Chalawsky v. Sun Refining & Marketing Co., Inc.*, 733 F.Supp. 791, 799–800 (D.Del.1990) (holding that no private right of action exists under the Act); *Wright v. ICI Americas, Inc.*, 813 F.Supp. 1083 (D.Del.1993) (same).

**7.** *See Ayres v. Jacobs & Crumplar, P.A.*, Del.Super., 1996 WL 769331, Quillen, J. (Dec. 31, 1996) (breach of covenant of good faith and fair dealing claim based on race and sex discrimination brought by an at-will employee did not state a cognizable claim; rather, plaintiff was required to rely on applicable statutory remedies); *Drainer v. O'Donnell*, Del.Super., 1995 WL 338700, at *2, Alford, J. (May 30, 1995 rev. Jul. 28, 1995)

(holding no common law cause of action for sexual harassment under Delaware law; employee's only state law recourse was under the Act); *Williams v. Caruso*, 966 F.Supp. 287, 292 (D.Del.1997) (plaintiff could not invoke public policy exception to at-will employment doctrine to press claim that she was discharged in retaliation for making a sexual harassment charge; because retaliatory discharge was already covered by 19 *Del. C.* § 726, the court predicted that the Delaware Supreme Court would not recognize an overlapping common-law cause of action for retaliatory discharge); *Finch v. Hercules Inc.*, 809 F.Supp. 309, 312 (D.Del.1992) (predicting that the Delaware Supreme Court would not recognize a common law cause of action for breach of the implied covenant of good

Mrs. Holland has not argued that these prior precedents are erroneous *in the precise respect* that they hold the Act does not permit complainants to prosecute claims under the Act by way of a private right of action. Nor do I perceive any error in the previous holdings that the Act, unlike Title VII, does not give complainants the option of proceeding by way of a *de novo* lawsuit under the Act. Rather, complainants must prevail within the administrative framework set forth in the Act.

Therefore, when the Department concludes that a charge is not viable and makes a Refusal or Dismissal Decision, its decision marks the end of the road for a complainant's charge under the Act, subject to any possible judicial review of that Decision. By its own terms, the Act does not provide any mechanism for judicial review of a Dismissal Decision under § 712(b). And the Act is silent on the rights of a complainant whose charge is not even accepted by the Department for processing. Indeed, there is no text in the Act that supports the proposition that the Department may refuse to accept a charge.

By contrast, when the Department concludes that there is reasonable cause to believe that a charge of unlawful discrimi-

nation has merit, that determination marks the beginning of a multi-step process. The next step involves conciliation efforts by the Department, whereby a consensual resolution of the charge is the desired end.[8] If the Department concludes that "it is unable to secure from the respondent a conciliation agreement acceptable to the Department and to the person aggrieved, *which determination shall not be reviewable in any court,* the Department shall issue ... a complaint." [9] This provision is notable, because the Act is silent on whether judicial review of a dismissal under § 712(b) is available, yet expressly states that there shall be no judicial review of a decision that an acceptable conciliation agreement could be reached.

Once the Department determines that no conciliation agreement can be forged, the Department shall "issue and cause to be served upon the respondent a complaint stating the facts upon which the allegation of the unlawful employment practice is based." [10] The complainant and the respondent then prepare for an evidentiary hearing, which is held before a "review board," the composition of which is set by statute.

At the review board hearing:

faith and fair dealing for a claim that an employee was discharged on the basis of his age, because Delaware case law had made only "careful incursions ... upon the employment[-]at-will doctrine" and that the Delaware Supreme Court would not incur further "where there is in place an elaborate statutory scheme addressing the same public policy concerns"); *cf. E.I. DuPont de Nemours & Co. v. Pressman,* Del.Supr., 679 A.2d 436, 441 & n. 11 (1996) (in discussing the breadth of the employment at-will doctrine, the Delaware Supreme Court states that the doctrine generally permits an employer to discharge an employee for any reason, but notes that "[o]f course, an employee's status in certain respects may not be the basis for discharge under federal and state law." The Court then

indicates that the case before it did not involve an allegation of unlawful discrimination based on a status or classification within the scope of the Act, and that claims of such discrimination are "within the jurisdiction of the Equal Employment Review Board."). *But see Schuster v. Derocili,* Del.Supr., 775 A.2d 1029 (2001) (plaintiff whose sexual harassment claim under the Act was dismissed by the department could sue under same theory as a breach of the contractual covenant of good faith and fair dealing).

8. *See* 19 *Del. C.* § 712(c).

9. 19 *Del. C.* § 712(e) (emphasis added).

10. *Id.*

Respondent and the person aggrieved shall be parties and may appear at any stage of the proceedings, with or without counsel.... All testimony shall be taken under oath and shall be reduced to writing.[11]

This part of the Act is significant because, among other things, it makes clear that the complainant has at that stage the personal right to present her own claim to the review board, deploying such strategy as she chooses.

After it hears a case, the review board has the following responsibility:

If the review board finds that the respondent has engaged in an unlawful employment practice, the review board shall state its findings of fact in writing and shall issue ... an order requiring the respondent to cease and desist from such unlawful employment practice and to take such affirmative action, including reinstatement or hiring of employees, with or without back pay ... as will effectuate the policies of this subchapter ... If the review board finds that the respondent has not engaged in any unlawful employment practice, the review board shall state its findings of fact in writing and shall issue ... an order dismissing the complaint.[12]

■ The Act contemplates judicial review of review board decisions, at the instance of either a complainant, a respondent, or any other party other than a member of the Department. To wit, § 712(h) of the Act states:

Any complainant or any aggrieved party other than a member of the Department, respondent or intervenor aggrieved by an order of the review board, including an order dismissing a complaint, may obtain judicial review, and the review board may obtain an order of the Court of Chancery for enforcement of its order. The proceeding for review or enforcement is initiated by filing a petition in the Court of Chancery.... Within 30 days after the service of the petition ... the review board shall transmit to the Court the original or a certified copy of the entire record upon which the order is based ... The Court may reverse or modify the order if substantial rights of the petitioner have been prejudiced because the findings of fact of the Department are clearly erroneous in view of the reliable probative and substantial evidence on the whole record. The Court shall have power to grant such temporary relief or restraining order as it deems just and to enter an order enforcing, as modified, or setting aside in whole or in part the order of the review board or remanding the case to the Department for further proceedings....

A party may move the Court to remit the case to the review board in the interest of justice for the purpose of adducing additional specified and material evidence and seeking findings thereon, provided the party shows good cause for the failure to adduce such evidence before the review board.

A proceeding under this section must be initiated within 30 days after a copy of the order of the review board is received, unless the Department is the petitioner. If no proceeding is so initiated, the review board may obtain a decree of the Court for enforcement of its order ....

The first sentence of § 712(h) is a bit of a muddle. The provision could be read to permit any party who is "aggrieved" by an order of the review board—other than a member of the Department—to seek an

---

11. *Id.* § 712(f).

12. *Id.* § 712(g).

on-the-record review of that order in this court. But § 712(k) of the State Discrimination Act throws in a twist, by stating:

The Superior Court of the county where the violation is alleged to have occurred shall have jurisdiction to hear an appeal from any decision made by the review board except as provided in subsection (h) of this section. Such appeal shall be on the record only before the Department.

Section 712(k) appears to clarify that when respondents (*i.e.*, employers) are aggrieved by a decision of the review board, their appeal rights are to the Superior Court. The rationale for this bifurcated appeal process is not spelled out in the statute itself, but one could speculate that the General Assembly believed that complainants would likely seek to enforce review board orders containing injunctive provisions and therefore provided that complainants would always have the right to enforce orders (and less logically) to appeal adverse rulings in a court of equity.

### B. *Mrs. Holland's Allegations*

The following recitation of facts is drawn from Mrs. Holland's proposed second amended complaint, which is assumed to be true for purposes of addressing the motions before me.[13] I have drawn all reasonable inferences in Mrs. Holland's favor.

As of the end of 2000, Mrs. Holland worked as the office manager for the medical practice of Dr. Zarif at his Lewes, Delaware office. Zarif employed at least four employees at all relevant times, and therefore is an "employer" covered by the State Discrimination Act.[14] He employed fewer than fifteen persons, however, and thus is not an employer subject to Title VII of the federal Civil Rights Act of 1964.[15]

Mrs. Holland's performance as office manager met or exceeded Dr. Zarif's requirements. Indeed, in October, 2001, Dr. Zarif sent Mrs. Holland to a medical conference in Chicago which included programs designed for managers of medical practices.

Dr. Zarif also went to the conference. He did not travel to Chicago with Mrs. Holland, or see her while they were both in Chicago. Dr. Zarif stayed at a different hotel in a different part of town, and attended different conference programs than did Mrs. Holland.

On January 16, 2001—almost three months after the conference—Mrs. Holland was confronted by Dr. Zarif's wife at his office. Mrs. Zarif told Mrs. Holland "that it was 'disgusting' that Mrs. Holland, a woman, should travel to a business conference with Dr. Zarif, a man."[16] Another office worker overheard this conversation.

A few days later, Dr. Zarif fired Mrs. Holland from her position, which paid $500 per week. Dr. Zarif admitted that he fired Mrs. Holland because Mrs. Zarif was upset with him and that terminating Mrs. Holland would help him keep the peace at home and appease his angry wife. Mrs. Holland's job performance, Dr. Zarif confessed, had nothing to do with her termination.

Mrs. Holland concluded that her termination was improper and discriminatory. She reasoned that she would not have been fired but for her sex. Clearly, Mrs. Hol-

---

**13.** The relevant facts are not materially different from those in the complaint of record. My ruling on either complaint would be the same.

**14.** 19 *Del. C.* § 710(2).

**15.** *See* 42 *U.S.C.* § 2000e(b).

**16.** Comp. ¶ 11.

land believed, Mrs. Zarif would not have stormed into the office and (implicitly but unmistakably) accused a male employee of sexual improprieties simply because the male employee had happened to attend an out-of-town conference in the same city as Dr. Zarif. Dr. Zarif's decision to fire Mrs. Holland was, she felt, premised on her sex, and his desire to remove a female employee who had generated unwarranted feelings of sexual jealousy in his spouse.

Mrs. Holland took her claim to the Department of Labor. Mrs. Holland's first contact with the Department was by phone. Defendant Trina Wheedleton of the Department listened to Mrs. Holland's story, told Mrs. Holland that there was no basis for a sex discrimination charge, and resisted Mrs. Holland's desire for an appointment. When Mrs. Holland insisted, Wheedleton relented and agreed to meet.

The two met the following day. Mrs. Holland presented Wheedleton with evidence in support of her version of events, and filled out the required forms to start the process by which the Department would consider her discrimination charge against Dr. Zarif under the Act. According to the complaint, the Department— through Wheedleton—did not accept Mrs. Holland's charge and follow the statutory procedure set forth in § 712(b) of the Act. Instead, rather than accepting the charge from Mrs. Holland, investigating the issue, and issuing a written decision setting "forth the facts upon which the decision" to dismiss the charge was "based",[17] Wheedleton simply told Mrs. Holland that she could not file a charge.

The complaint suggests that Wheedleton refused the charge because she, and superiors with whom she consulted, did not believe that Mrs. Holland had alleged facts that, if true, supported a claim of sex discrimination. The complaint alleges that this refusal to accept a charge is part of a larger practice at the Department of turning away discrimination claimants without accepting charges and conducting an investigation. According to the complaint, line workers and their immediate superiors at the Department—all of whom allegedly lack formal legal training—act as gatekeepers and make on-the-spot judgments regarding whether particular factual allegations state a claim of unlawful discrimination under state or federal law. The complaint insinuates that the Department refuses a large percentage of charges in order to conserve its resources.

The Department's refusal to accept Mrs. Holland's charge marked the end of the administrative process. This refusal had special importance because Mrs. Holland was not eligible to lodge a "dual-filed charge" alleging a violation of both the Act and Title VII. Her only statutory remedy was under state law.

## II. *The Motions Before The Court*

The Department of Labor and Dr. Zarif have moved to dismiss Mrs. Holland's complaint. The primary argument made in support of those motions is that the Department has the unreviewable discretion to refuse to accept a charge of discrimination under the Act. As a result, the defendants assert that this court lacks subject matter jurisdiction and that Mrs. Holland's claim of sex discrimination must be dismissed pursuant to Court of Chancery Rule 12(b)(1).

The Department and Dr. Zarif press that argument together.[18] In the alternative, they make slightly different argu-

---

17. 19 *Del. C.* § 712(b).

18. Dr. Zarif did not originally make this argument in his motion, but happily adopted it thereafter.

ments to deal with the possibility that the Department might be found to have had a legal duty to at least allow Mrs. Holland to file a charge of discrimination, even if it retained the legal discretion to dismiss that charge. For his part, Dr. Zarif contends that this court cannot consider an argument that the Department breached its statutory duties by refusing to permit Mrs. Holland to file a claim. He argues that a claim of this nature could be brought via the writ of *mandamus*, and therefore must be asserted in the Superior Court.

The Department takes a different tack. It contends that the writ of *mandamus* cannot be appropriately used to review the Department's decision whether to allow the filing of a charge, because that decision involves the exercise of discretion.

In essence, I construe the Department's position on subject matter jurisdiction as being singularly focused on the argument that the Act does not contemplate judicial review of a Departmental decision either to (i) refuse to accept a discrimination claim or (ii) dismiss a claim under § 712(b). That is, the Department's argument is based on whether any court has jurisdiction over Mrs. Holland's claim, rather than whether this court does. If the Department does not prevail on that argument, it falls back on the argument that Mrs. Holland has not stated a claim for sex discrimination under the State Discrimination Act and that her complaint should be dismissed under Rule 12(b)(6). Based on this same reasoning, the Department contends that this court cannot conclude that its failure to accept Mrs. Holland's claim constituted an abuse of discretion. This contention elides the jurisdictional basis for this court's review,

but implicitly seems to recognize the precedent suggesting that this court retains the authority to review discretionary decisions of administrative agencies when no other adequate form of judicial review is available and no legislative intent to preclude review exists.[19]

Mrs. Holland argues that the motions to dismiss should be denied. In support of this contention, she submits that the Act contemplates Court of Chancery review of all Departmental, as well as review board, decisions to reject a discrimination charge. She bases this contention on the structure of the Act, and the Act's explicit ban on judicial review of Department decisions concluding that an acceptable conciliation agreement could not be forged. Mrs. Holland suggests that because the Act does not explicitly bar judicial review of Departmental Dismissals or Refusal Decisions, the logical inference is that the Act contemplates that this court would review whether such Decisions were based on substantial evidence or a correct interpretation of the Act. In the alternative, she contends that this court may review the Department's actions under equitable principles permitting judicial review of administrative decisions affecting substantial rights, when those decisions are not subject to adequate judicial review in another court under a statute or a common-law writ of review.

On the merits, Mrs. Holland argues that she set forth facts, that if true, state a claim for sex discrimination. She contends that it was an abuse of discretion for line employees of the Department without formal legal training to make a legal conclusion that her firing did not involve prohibited sex discrimination. The interpre-

---

19. *See, e.g., Couch v. Delmarva Power & Light Co.*, Del.Ch., 593 A.2d 554, 560–561 (1991); *Harmony Constr., Inc. v. State Dep't of Transp.*, Del.Ch., 668 A.2d 746, 749–50 (1995).

tation of the Act is ultimately a job for the courts, she claims, and this court should intercede when it appears that a claimant was denied access to a review board by an untenable interpretation of the statute by the Department.

### III. Does The Complaint State A Claim In Equity That The Department Wrongfully Refused To Accept Mrs. Holland's Claim?

### A. Is Judicial Review Of Refusal And Dismissal Decisions Available Under § 712(h) of The State Discrimination Act?

■ In assessing the extent to and method by which the judiciary may review the Department's refusal to accept Mrs. Holland's claim, it is useful to begin by noting that the statute which most generally addresses judicial review of agency action is inapplicable to the Department of Labor and the review board. That statute is this state's version of the Administrative Procedures Act, or "APA." [20]

Instead of subjecting the Department and the review board to the forms of judicial review contemplated by the APA—which include *mandamus* review [21]—the General Assembly crafted a statute-specific approach to judicial review of agency action under the State Discrimination Act. The initial question thus becomes how extensively the express terms of the Act afford the right to judicial review.

I begin to answer that question by pointing out what is not in doubt. It is undisputed that § 712(h) of the Act provides a right to judicial review to any complainant aggrieved by an order of the review board, including by "an order dismissing a complaint." [22] It is equally clear that, by the explicit language of the Act, one type of Departmental action cannot be reviewed by the judiciary: a Departmental decision that an acceptable conciliation agreement cannot be forged (a "Conciliation Decision"). [23] With that, we leave clarity.

The next logically necessary inquiry is whether the Act itself can be read as implicitly authorizing judicial review under § 712(h) of Departmental Decisions that have the practical effect of acting as a final order dismissing a discrimination allegation. Mrs. Holland argues that the overall structure of the Act supports the conclusion that the General Assembly viewed § 712(h) as providing a right to judicial review of any dismissal order under the Act, including a Departmental Dismissal Decision under § 712(b). Because the Department's refusal to even accept Mrs. Holland's claim operated as a less accountable and responsible form of dismissal, Mrs. Holland argues that § 712(h) also provides a vehicle for judicial review of that decision.

In support of that argument, Mrs. Holland makes a few points. Initially, Mrs. Holland argues that it is unreasonable to assume that the General Assembly invested the Department with the unreviewable discretion to dismiss discrimination complaints. The Act, she asserts, is a remedial statute and should not be construed to permit the implementing administrative agency the unaccountable power to undermine the statute by executive fiat or indifference.

As a matter of statutory text, Mrs. Holland points to the express prohibition of judicial review of Conciliation Decisions as supporting the legislature's intent to au-

---

**20.** *See Del. C. Ann.,* tit. 29, ch. 101 (2000).

**21.** *29 Del. C.* § 10143.

**22.** *19 Del. C.* § 712(h).

**23.** *Id.* § 712(e).

thorize judicial review of Departmental Dismissal and Refusal Decisions under § 712(h). Mrs. Holland also stresses the explicit reference in § 712(h) to this court's power to review dismissal orders, as well as the language giving this court authority to "grant such temporary relief or restraining order as it deems just and to enter an order enforcing, as modified, or setting aside in whole or in part the order of the review board *or remanding the case to the Department* for further proceedings."[24] These provisions are said to evidence an expansive approach to judicial review by the General Assembly, at odds with the notion that the Department may dismiss discrimination claims without facing judicial review.

Her arguments, however, are too weak to overcome the statutory language bolstering the conclusion that Departmental Dismissal and Refusal Decisions are not reviewable under § 712(h) or, for that matter, § 712(k). In reaching that conclusion, I lean most heavily on the plain text of those provisions, which both refer only to judicial review of decisions of the review board. Although there are some hints to the contrary, the overall intent of the General Assembly to limit review under those subsections to orders of the review board is unambiguous. For example, § 712(h) is replete with references to the review board, which cannot be read as inadvertent. For instance, the first sentence of that section permitting judicial review of "an order of the review board, including an order dismissing a complaint" indicates merely that dismissal orders are among the *review board* orders subject to judicial review. It does not suggest, as Mrs. Holland urges, that all dismissal orders under the Act are reviewable. Moreover,

§ 712(h) plainly refers to orders dismissing "complaints," not orders dismissing "charges."

### B. *Can This Court Review Departmental Refusal And Dismissal Decisions Under the State Discrimination Act For Abuse Of Discretion?*

■ Having rejected Mrs. Holland's position that Departmental Refusal or Dismissal Decisions can be reviewed under § 712(h) or (k), I must confront another question: Is a Refusal or Dismissal Decision, as the Department urges, unreviewable at all by a court? That is, has the General Assembly signaled an intent to preclude judicial review of Refusal or Dismissal Decisions altogether? For the following reasons, I conclude that the General Assembly did not intend to preclude judicial review and that review in this court is available.

I begin by noting the serious Due Process Clause[25] implications that would arise were I to find that the Department has the unreviewable discretion to refuse to accept a discrimination charge or to dismiss a charge. By the enactment of the State Discrimination Act, the General Assembly afforded victims of discrimination a means of redressing unlawful discrimination. An Illinois anti-discrimination statute similar in material respects to Delaware's Act was found by the United States Supreme Court to create a property interest on the part of discrimination claimants.[26] The property interest consisted in the claimants' cause of action under the Illinois act. Having found that the Illinois act conferred a property interest on discrimination complainants, the Supreme Court naturally found that complainants could not be de-

---

24. Emphasis added.

25. *See U.S. Const.* Amend. XIV, § 1.

26. *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 429–31, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982).

prived of their interests (*i.e.*, their causes of action) without due process of law.[27]

To the extent that I were to hold that the Department has the unreviewable discretion to refuse to accept discrimination charges, the Act would be vulnerable to an allegation of unconstitutionality, such as that alleged by Mrs. Holland in her proposed second amended complaint. The Department's interpretation of the Act subjects claimants such as Mrs. Holland to the untrammeled will of Departmental line employees, who could refuse claims because they did not wish to be bothered, because they did not like what claimants were wearing, or based on unreasoned interpretations of the Act. That is, the Department would have the opportunity to refuse charges and capriciously deprive claimants of their cause of action under the Act without a hearing or any possibility of judicial review. I doubt seriously that the General Assembly intended to confer upon the Department that type of free rein.

The serious due process issue raised by the Department's argument is illustrated by the federal and state case law dealing with the protections that must be afforded to discrimination claimants in order for the Due Process Clause to be satisfied. Many cases have addressed whether Title VII can vest unreviewable discretion in the EEOC to dismiss a claim of discrimination. The decisions have held that the statute can do so because the claimant remains free to press her statutory discrimination claim by way of a private right of action in a court of law, irrespective of the EEOC's decision to dismiss. Because the claimant retains the right to bring her discrimination claim in court, the cases reason that the administrative agency's dismissal does not deprive her of her property.[28] Likewise, decisions have upheld state discrimination regimes that vest discretion in an administrative agency to dismiss discrimination charges short of a full hearing, but have relied heavily upon the availability of judicial review or a private right of action under the state statutes as providing sufficient due process.[29]

The problem for the Department is that the Act does not provide the safety valve of a private right of action.[30] A refusal by the Department of a charge deprives a claimant of her cause of action with finality. A decision by the Department of that kind is an important one, which affects property rights of a substantial nature. It seems to me to be doubtful that the Due Process Clause permits such an important right to be taken from a claimant by line

**27.** *Id; see also Bennett v. Tucker*, 827 F.2d 63, 70 (7th Cir.1987).

**28.** *See, e.g., Johnson v. Rodriguez*, 943 F.2d 104, 110 (1st Cir.1991); *Georator Corp. v. EEOC*, 592 F.2d 765, 768–69 (4th Cir.1979); *Adams v. EEOC*, 932 F.Supp. 660, 665 (E.D.Pa.1996); *Hall v. EEOC*, 456 F.Supp. 695, 702–03 (N.D.Cal.1978).

**29.** *E.g., Lemon v. Tucker*, 695 F.Supp. 963, 972–73 (N.D.Ill.1988); *Folbert v. Dep't of Human Rights*, 303 Ill.App.3d 13, 236 Ill.Dec. 463, 707 N.E.2d 590, 595–96 (1999); *Luckett v. Human Rights Comm'n*, 210 Ill.App.3d 169, 155 Ill.Dec. 6, 569 N.E.2d 6, 11–14 (1991); *May v. Ohio Civil Rights Comm'n*, 58 Ohio App.3d 56, 568 N.E.2d 716 (1989); *Sprague v.*

*Glassboro State College*, 161 N.J.Super. 218, 391 A.2d 558 (App.Div.1978); *Mahdavi v. Fair Employment Practice Comm'n*, 67 Cal. App.3d 326, 136 Cal.Rptr. 421, 425–428 (1977).

**30.** I suppose one could argue that some of my reasoning might support recognition of a private cause of action under the Act. It seems to me less drastic and more respectful of the General Assembly's intent to hold that judicial review of Departmental Refusal and Dismissal Decisions is available, thus providing a safeguard to complainants while still requiring them to present their allegations to the Department for initial screening and, if they survive that process, to press their cases before the statutorily created review board.

employees of a Department, who act without a hearing, without necessarily obtaining formal legal advice, without producing a written decision, and without being subject to judicial review. The balancing test of *Mathews v. Eldridge*[31] seems to tilt against the validity of such an approach. Similarly, the Act remains suspect under the Due Process Clause if Dismissal Decisions are not subject to judicial review. Such Decisions are issued without a hearing and allegedly with little input from legal advisors. Without the possibility of judicial review, substantial rights accorded by the Act are therefore arguably subject to deprivation without reasonable procedures to prevent errors.

Because the Department's interpretation of the Act raises a serious constitutional issue, I am reluctant to embrace it without compelling evidence that the General Assembly affirmatively wished to preclude judicial review of Refusal and Dismissal Decisions.[32] Upon careful examination of the Act, I am unable to find clear evidence of such an intent. In this regard, I note that the General Assembly knew how to preclude judicial review of Departmental Decisions under the Act. Section 712(e) explicitly prohibits judicial review of Conciliation Decisions. But the Act contains no similar prohibition against judicial review of Departmental Refusal or Dismissal Decisions. The General Assembly's express ban on judicial review of a Departmental act of discretion in one part of the Act supports the inference that other Departmental acts of discretion remain open to review.

I admit that the General Assembly's failure to address the method for obtaining judicial review of Departmental Refusal or Dismissal decisions can be read as evidencing its view that such decisions should be beyond the purview of the courts.[33] But that is not the only reasonable reading of the Act. Instead, the Act can also plausibly be read as leaving Departmental Refusal and Dismissal decisions to review under default principles of law. The Delaware case law is replete with situations when the actions of administrative agencies or bodies have been reviewed, in the absence of any statutory method of judicial review. The General Assembly cannot be said to be ignorant of the availability of such review. In this circumstance where the unavailability of such review would raise a serious constitutional question and where the General Assembly has proscribed the use of such review explicitly in one situation under the Act but not in any other, I find that the best reading of the Act is that these default principles of law are applicable.[34]

■ In further support of that conclusion, I note that the Act is a remedial

31. 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

32. *Couch,* 593 A.2d at 561 (the equitable form of judicial review over administrative decisions exists in part to address Due Process Clause concerns).

33. That is, the Act could be read as embodying a very conservative approach, whereby the Department has the unreviewable discretion to act as a gatekeeper over claims under the Act, thus protecting the smaller employers the Act primarily affects.

34. In *Choma v. O'Rourke,* Del.Ch., 300 A.2d 39, 41 (1972), this court stated:

The general rule is that, in the absence of governing constitutional provision, a right to appeal may be granted or withheld at the discretion of the legislature and it does not exist unless specifically granted by statute. 2 AM. JUR. 2D, *Administrative Law,* § 557. It does not follow, however, that judicial power to review an administrative proceeding depends upon statutory appellate provisions. On the contrary, a court will review an administrative decision, even in the absence of such a statute, if the action by the agency was arbitrary or an abuse of discre-

statute designed to advance the important public policy of protecting victims of forms of discrimination our society has come to regard as intolerable.[35] Therefore, I am reluctant to read it as giving discrimination claimants less of a right to judicial review than would be enjoyed by any citizen affected by another type of adverse final, administrative determination.

My decision is admittedly in conflict with that reached by Judge Latchum in *Chalawsky v. Sun Refining & Marketing Co., Inc.*[36] In that case, a plaintiff named Chalawsky alleged that his employer Sun Refining committed age discrimination in violation of § 711 of the Act. Chalawsky filed charges with the Department, which were dismissed under authority of § 712(b) for lack of substantiation. After dismissal, Chalawsky filed suit, attempting to state a direct claim under the Act, or in the alternative, seeking judicial review of the Department's Dismissal Decisions.

Sun Refining moved to dismiss, arguing that Chalawsky had no private right of action under the Act and that the Act did not contemplate judicial review of Departmental Dismissal Decisions.

Judge Latchum granted the motion, stating:

> Chalawsky argues that even though the statute does not authorize an independent cause of action or judicial review of the DDOL's findings, this Court should presume that the statute grants such a right because judicial review is not spe-

cifically prohibited. Chalawsky's reasoning is seriously flawed. Although the state legislature authorized judicial review of the review board's findings, it also expressly insulated from review the DDOL's determination that a complaint should be issued because voluntary compliance would not be forthcoming.... It therefore seems unlikely that a matter such as an initial determination of probable cause, which is also within the DDOL's discretion, was meant to be reviewable in court. Likewise, given the unreviewable discretion granted to the DDOL, it seems unlikely a private right to sue—despite an unfavorable determination by the DDOL—was intended. This Court will not presume the Delaware legislature intended remedies it did not include in the statute.[37]

Judge Latchum's conclusion regarding the availability of judicial review is by no means an untenable one. But he did not face the constitutional issue posed by the briefing in this case, which is that an interpretation of the Act that permits the Department to refuse a charge or to dismiss a charge without a hearing or any possibility for judicial review subjects the Act to challenge under the Due Process Clause. One of the reasons he may not have faced that question is that the Chalawsky case involved a dual-filed charge, and the plaintiff's federal age discrimination charge was held to have survived the defendants' motion for summary judgment.

tion. 60 AM. JUR. 2D, *supra*, § 71; 2 AM. JUR. 2D, *supra*, § 556. This is so because in the administration of a statutory remedy, a discretion abused or exercised is no remedy at all. And equity will grant relief in such situations if there is no adequate remedy at law.

**35.** See *Stop & Shop Cos. v. Gonzales*, Del. Supr., 619 A.2d 896, 898 (1993) (when a statute may be deemed remedial legislation, the court is required to accord it a broad

construction to accommodate the legislative will).

**36.** 733 F.Supp. 791 at 799–800.

**37.** *Id.* at 799. The reasoning of the *Chalawsky* decision that no judicial review of Departmental Dismissal Decisions was available was embraced by the United States District Court for the District of Delaware again in *Wright*, 813 F.Supp. at 1091 and by the Superior Court in *Drainer*, 1995 WL 338700, at *2.

Moreover, I question whether the General Assembly's explicit insulation of Conciliation Decisions provides any reliable indication of a supposedly identical intention to implicitly insulate Departmental Refusal or Dismissal Decisions from judicial review. There is a logical reason why Conciliation Decisions would be made non-reviewable, which is that the General Assembly believed it unwise to allow a party to appeal a decision of the Department that a mutually acceptable settlement could not be forged. Such a decision does not in any way constitute final agency action depriving anyone of substantial rights. By contrast, Refusal and Dismissal Decisions do.

### C. Does This Court Have Jurisdiction To Hear Mrs. Holland's Claim That The Department Mishandled Her Discrimination Claim?

■ Having concluded that the Act does not preclude judicial review of Departmental Refusal and Dismissal Decisions, I now reach the question of what form of judicial review is available. Two forms of review have been bandied about by the parties: *mandamus* review or equitable review for abuse of discretion. The first form of review is available in the Superior Court. The second is equitable in nature and has been used when an adequate remedy at law does not exist to rectify an allegedly improper exercise of administrative discretion.

The Delaware case law distinguishing among the various non-statutory forms of judicial review used to evaluate the actions of administrative agencies is less than precise. In considering whether the equitable form of review is available, I put to the side for the moment the subsidiary question of whether the Department had a non-discretionary statutory duty to allow Mrs. Holland to file a charge and to follow the steps prescribed in § 712(b) before dismissing her charge. For now, I focus solely on whether, as Mrs. Holland urges, this court may review whether the Department abused its discretion or committed an error of law in dismissing a complaint pursuant to § 712(b). I consider this question because the Department itself has argued that a Refusal Decision is essentially an exercise of Departmental discretion akin to a Dismissal Decision, and because Mrs. Holland urges the same proposition, but contends that the exercise is unlawful.

■ Framing the issue in the manner posed by the parties, I find that there is no adequate remedy at law. A writ of *mandamus* would not permit the court to review whether the Department's implicit decision to dismiss Mrs. Holland's complaint was contrary to law or an abuse of discretion. The *mandamus* writ only exists to compel the performance of a legal duty, not to control how that duty is performed.[38]

Moreover, the complaint makes serious allegations regarding the deficiency of the Department's practices in dealing with complainants, which seem to more naturally fall within the equitable form of judicial review. In the past, that equitable review

**38.** No party has urged that review by writ of *certiorari* would be adequate. My instinct is that it would not be adequate for the following reasons. *Certiorari* is only available to review a decision made in a quasi-judicial proceeding before a lower tribunal or administrative agency. *Couch,* 593 A.2d 554 at 560. This feature of the writ makes review of Departmental Refusal and Dismissal Decisions under the writ doubtful because such Decisions precede the quasi-judicial review board hearing process. *See Luckett* 155 Ill.Dec. 6, 569 N.E.2d at 11 (early stages of processing discrimination charges under state act are not quasi-judicial in nature and thus do not require full panoply of hearing and due process rights); *Quaker Hill Place v. Saville,* Del.Super., 523 A.2d 947, 966–67 (1987) (stating that when an administrative agency acts in a quasi-judicial capacity it must adopt proce-

form has been used by this court to examine whether an agency's decision was an abuse of discretion, in light of all the factual and legal circumstances relevant to the decision.[39] This less constrained form of review seems to be necessary if Mrs. Holland's allegations are to be examined adequately.[40] As a matter of efficiency, it also seems useful that all petitions by complainants for judicial review under the Act be presented to one court, rather than balkanizing review duties. The process of

seeking judicial review should not put complainants through a game of jurisdictional guesswork. Therefore, I conclude that the complaint states a claim within this court's equitable jurisdiction.[41]

D. *Has Mrs. Holland Stated A Claim That The Department Abused Its Discretion By Refusing To Allow Her To File Charge?*

■ Having determined that this court has the power to review the Department's

---

dural and ethical formalities akin to those used in the judicial process). Even assuming one can get past this substantial problem, another feature of *certiorari* review renders it inadequate. That writ does not permit the reviewing court to consider all the factual circumstances relevant to the agency's decision. Instead, the court is limited to reviewing the paper record created by the agency, and the evidence submitted to the agency is not considered part of the record. *See, e.g., Rodenhiser v. Dep't of Public Safety*, Del.Super., 137 A.2d 392, 393–94 (1957). This feature of the writ makes its application to Departmental Refusal and Dismissal Decisions problematic, especially here where the Department did not create any record. In the past, the Supreme Court has found that equitable review was necessary where a plaintiff needed to establish the facts and circumstances underlying agency action in order to sustain her claim. *Lynch v. Tunnell*, Del. Supr., 236 A.2d 369, 373–74 (1967). That necessity seems to exist here.

**39.** *See, e.g., Couch*, 593 A.2d at 554; *Harmony Const. Inc.*, 668 A.2d at 746.

**40.** *Lynch*, 236 A.2d at 373–74.

**41.** No one familiar with the precedents would contend that the decision I reach is free from doubt. Our courts have drawn rather haphazard and circumstantial lines among the various forms of review, such that the forms of review can be considered plastic in the hands of well-motivated jurists seeking to do justice in particular cases. For example, most decisions have held that a court cannot determine whether an agency's decision was supported by substantial evidence on *certiorari* review. *See, e.g., Castner v. State*, Del. Supr., 311 A.2d 858, 858–59 (1973). In other

cases, our courts have appeared to ignore this limitation and to use the writ as a *de facto* method of conducting the type of substantial evidence review typical of a case decision appeal under the APA. *See, e.g., Hanby Corners Community Fire & Ambulance Assoc., Inc. v. State Fire Prevention Comm'n*, Del. Supr., 507 A.2d 539, 541 (1986) (affirming ruling of State Fire Prevention Commission on *certiorari* review in part because its decision was supported by sufficient evidence). By way of further example, in a series of cases involving police pensions, the Delaware courts reached results that, if fair in result, were hardly orderly in clarifying what form of judicial review, if any, was appropriate to review a pension board's decision to deny a pension. Courts came to different conclusions regarding whether *mandamus* was available as mechanism for such review. *Compare State ex rel. Mulrine v. Dorsey*, Del. Supr., 272 A.2d 709 (1970) (*mandamus* review deployed); *Sabo v. Williams*, Del.Ch., 303 A.2d 696 (1973) (*mandamus* review available) *with Mason v. Bd. of Pension Trustees*, Del.Super., 468 A.2d 298, 301 (1983) (*mandamus* review unavailable). Indeed, the case law was so muddled that in separate well-reasoned decisions then-Vice Chancellor Brown and then-Superior Court Judge Walsh both concluded that *mandamus* and *certiorari* were probably not appropriate vehicles for review, and issued orders with problematic effects for the litigants before them. Vice Chancellor Brown reasoned that Superior Court review was doctrinally improper, but transferred the case before him that court on the basis of prior precedent holding to the contrary. *See Bramble v. Dannemann*, Del. Ch., 1980 WL 6366, at *2, Brown, V.C. (Jan. 10, 1980) (*certiorari* and *mandamus* review not appropriate as a matter of doctrinal logic

Refusal Decision, I now turn to whether the complaint has stated a claim that the Department's Refusal Decision was an abuse of discretion. In this respect, the motion turns on two questions: 1) Does the Act give the Department the discretion to make a Refusal Decision at all?, and, if so, 2) Does the complaint set forth facts stating a claim that the Department abused its discretion or committed legal error? I begin with the first question.

The Department was asked over and over again by this court to identify the source of the Department's "power" to refuse to accept a charge of discrimination.[42] The only reply was that the Department had done this for years and that it would be a burden to follow the plain language of the statute.[43]

By its own terms, § 712(b) of the Act does not give the Department the power to refuse a charge of discrimination. Instead, it imposes upon the Department the non-discretionary duty to perform acts that, themselves, involve discretion. Most fundamentally, these acts include the duty to accept a charge, to investigate it, and to determine whether to dismiss the charge or to process it further. In the event that the Department determines to dismiss the charge, it is duty bound to issue a written explanation of the basis for its decision. In the lexicon of the Due Process Clause, § 712(b) articulated the administrative process "due" to claimants and which the Department must follow if it wishes to dismiss a claim.

Within the language of § 712(b), there is arguably enough flexibility to permit the Department to investigate[44] only the legal aspects of a charge. That is, the Department can accept a charge, serve it on the employer, and investigate as an initial matter whether the facts stated by the complainant would, if true, support a claim for unlawful discrimination. If the Department determines that the alleged facts do not support a claim of discrimination under the Act, it can then issue a written dismissal order explaining its reasoning. Such written orders fulfill an important function because they create a written rec-

---

but available as a matter of precedent, thus no Chancery jurisdiction existed). Judge Walsh held that the prior precedent using *certiorari* and *mandamus* review to examine whether a pension had been improperly denied was not sound and thus he dismissed the case before him for lack of Superior Court jurisdiction. Judge Walsh allowed the petitioner the right to refile in Chancery, while noting that the petitioner faced possible dismissal there on the basis of the prior precedent holding that Superior Court review was available and that Chancery therefore lacked jurisdiction to hear the claim. *Mason*, 468 A.2d at 299–301.

In yet another case, Chancellor Duffy held that the administrative denial of a police disability pension was reviewable in Chancery under the equitable doctrine for abuse of discretion. *Choma v. O'Rourke*, Del.Ch., 300 A.2d 39 (1972).

42. The Department conceded that as a matter of practice, it often refuses charges.

43. The Department has repeatedly stressed that its employees are often able to persuade complainants that they have no cognizable claim under the Act, and therefore convince those complainants not to file a charge. The Department obviously has the discretion to interact with complainants and to give them information which might convince them not to file charges. The question presented here is whether the Department has the power to preclude the filing of a charge when a complainant wishes to do so, despite the Department's entreaties to the contrary. Mrs. Holland's claim, however, is that she insisted on filing a charge and was denied that opportunity.

44. In the colloquial as opposed to the legal sense, "investigate" has been defined as "to make a systematic investigation, [especially] to conduct an official inquiry." WEBSTER'S NEW COLLEGIATE DICTIONARY 636 (9th ed.1988).

ord of Departmental action enabling more effective judicial review, and engendering Departmental accountability by facilitating the General Assembly's oversight of whether the Department is properly performing its statutory role. As things now stand, the Department's line staff make legal and factual decisions of great importance without following the statutory process. They thereby escape any requirement to make a record of their decisions, denying complainants the process due to them by law, the courts a reliable basis for judicial review, and the General Assembly the material to evaluate the Department's performance.[45] The Department's current method of proceeding runs afoul of the mandatory requirements of the Act.[46]

In this case, the Department violated § 712(b) by making a *de facto* dismissal of a discrimination charge without a written decision. Its violation has left this court and, more important, Mrs. Holland and the General Assembly, with no record of why the Department has acted. The Department now suggests that the reason (among others) is that the Department concluded that Mrs. Holland had not articulated facts, if true, which state a discrimination claim. But the Department did not write down why that was so, in a situation where intelligent minds could forge strong arguments on both sides of the question. Section 712(b) does not give the Department the power to act without simultaneously exposing its reasoning through the rigorous process of writing.

■ This thought leads me to the next question, which is whether the Department abused its discretion by supposedly determining that Mrs. Holland did not allege facts that, if true, supported a claim of unlawful sex discrimination under the Act. I emphasize supposedly because the absence of a written decision renders it hazardous to guess why the Department's Refusal Decision was made. In its briefs, the Department argues that Mrs. Holland was not fired because she was a woman, but because she was a particular woman who inspired jealousy in the spouse of her employer. The Department contends that a jealousy-based firing of this nature does not involve sex discrimination. At oral argument, however, the Department advanced a different basis for its decision, which is that Mrs. Holland was fired because of a "power struggle" between her and Mrs. Zarif. Although this factual argument is not cognizable on a motion to dismiss and was unsupported by any articulated facts, it buttresses my hesitation to decide whether Mrs. Holland has stated a claim for sex discrimination under the Act before giving the Department an opportunity to address that question in the deliberative manner contemplated by the Act. At this juncture, I really do not know why

---

**45.** The requirement that an administrative agency provide some basis for its decision is a basic requirement of due process. *See, e.g., Bowen v. American Hospital Ass'n*, 476 U.S. 610, 627, 106 S.Ct. 2101, 90 L.Ed.2d 584 (1986). The requirement for a writing also provides another important instrumental benefit: the process of writing forces the decisionmaker to expose the basis for its reasoning, an exercise that sometimes leads the decisionmaker to conclude that a different outcome than the decisionmaker was initially inclined to reach is the correct one.

**46.** In this narrowest respect, a *mandamus* petition perhaps would have been sufficient to suit Mrs. Holland's needs. The reason is that the court is only compelling the Department to carry out its mandatory duty to perform a discretionary act, and is not presuming to dictate how that discretion should be exercised. *Darby v. New Castle Gunning Bedford Educ. Ass'n*, Del.Supr., 336 A.2d 209, 211 (1975); *Bramble* 1980 WL 6366 at *2.

the Department acted as it did—and, frankly, I am not sure the Department does, either.

While Mrs. Holland argues that the administrative process is so tainted that she should as a remedy be given a judicially created right to press her discrimination claim under the Act directly in court, that remedy is most likely prohibited by the statute. In any event, a more logical remedial step would be to require the Department to file a complaint allowing Mrs. Holland to proceed to a review board hearing. But even that step seems to me to be premature. For its part, the Department's invitation to have me review a non-existent decision based on the shifting arguments it has submitted in its papers is not one I am inclined to accept. The Department plays an important role in giving life to the State Discrimination Act. It would be hubristic for me to assume that I would not benefit from the applied and expert thinking of the Department, *in consultation with its legal advisors*, on the question of whether Mrs. Holland's situation implicates the protections of the Act. Unlike Mrs. Holland, I believe that the Department should be given the opportunity to revisit her claim in good faith *and with an open mind.*

Rather than shoot in the dark, therefore, I propose to defer any ruling on whether Mrs. Holland has stated a claim under the Act, so as to give the Department an opportunity within the next 60 days to consider that question anew and to make a *de novo* decision whether to dismiss her charge or to initiate the conciliation and complaint process. If the Department concludes that Mrs. Holland has stated a claim, that will obviate the need for any near-term judicial involvement. If the Department concludes that she has not stated a claim and dismisses her charge, the court will then have the benefit of reviewing a formal, written Dismissal Decision.

Because the parties have devoted a good deal of argument to the merits, I do note a few factors that the Department should bear in mind in reviewing Mrs. Holland's claim. First, I note that the complaint states facts that, if true, support the inference that Mrs. Holland would not have been terminated "but for" her status as a woman.[47] It is quite unlikely that Mrs. Zarif would have harbored sexual suspicions if a male employee had traveled to the same conference as Dr. Zarif. Thus, Mrs. Holland's firing was inspired in a critical way by her sex.

Second, sex discrimination statutes have typically been interpreted as preventing employees from being treated differently on the basis of a stereotype linked to a protected status.[48] In this respect, Mrs. Holland has pled a situation fraught with stereotypical reasoning. Mrs. Zarif came

47. *Barnes v. Costle*, 561 F.2d 983, 990 (D.C.Cir.1977) (using "but for" test as a method of evaluating a Title VII sexual harassment claim); *see also Spain v. Gallegos*, 26 F.3d 439, 448 (3d Cir.1994) (where workplace rumors that plaintiff was having an affair with her supervisor were pervasive, likely to be injurious to her promotional opportunities, and would not have occurred if she was not a woman, the plaintiff had made a showing that sex was a substantial factor in her treatment and thus stated a sex discrimination claim).

48. *See, e.g., Price Waterhouse v. Hopkins*, 490 U.S. 228, 251, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality decision); *Drinkwater v. Union Carbide Corp.*, 904 F.2d 853, 862 (3d Cir.1990) ("To the extent that [the evidence] support[s] a finding that employment decisions were being made on the basis of sexual stereotypes, [that evidence] support[s] a sex discrimination claim.").

to the belief that Mrs. Holland was having a tryst with Dr. Zarif, solely because they attended an out-of-state conference at the same time. Why else would a female office manager attend an out-of-state conference in the same city as her male medical doctor employer? It could not be that the office manager and the doctor were both attending to obtain legitimate professional education, because this would contradict stereotypical day-time television notions about how the world of work really operates.[49] The pled facts indicate that Dr. Zarif gave into to his wife's stereotypically driven views and made those the basis for his decision to fire Mrs. Holland, in order to avoid domestic turbulence. As Mrs. Holland points out, Dr. Zarif's natural desire to protect his marriage would not, one can safely venture, have provided him with legal cover if his spouse had been uncomfortable with him having African–American employees and had asked him to get rid of them.

Third, the Department seems to argue that there is no "comparative" evidence of discriminatory intent because Dr. Zarif apparently has an all-female workforce, even after Mrs. Holland's departure. This is an odd argument for a couple of reasons. Initially, it seems to adopt a view that a woman cannot be a victim of sex discrimination if an employer does not subject other women employees to similar treatment. That is, a woman is not a victim of sex discrimination if she is subjected to treatment, not because she is any woman, but because she is a particular woman. This line of reasoning was tossed out early in the development of the law of sexual harassment.[50] Just because every woman is not being harassed, does not change the fact that women who are suffer that treatment *"because"* [51] they are women—that is, because of their sex.[52] While what happened to Mrs. Holland differs from sexual harassment in content, the reality is that like a victim of sexual harassment, she was deprived of her job for reasons that seem inextricably linked to her sex. It is not clear why a defense that other women in Dr. Zarif's employ did not elicit Mrs. Zarif's sexual jealousy should be any more availing in this context than it would be in the context of a sexual harassment claim.

Fourth, the Department might also consider what implications its rejection of Mrs. Holland's claim would have in other factually analogous scenarios. Suppose, for example, that Dr. Zarif were the head of a large medical department at a hospital, and that an important conference was held every year. Several employees from his department went with him every year and it was useful for their career development to attend. One year, Dr. Zarif takes

---

**49.** *Cf. Spain,* 26 F.3d at 448 ("Unfortunately, traditional negative stereotypes regarding the relationship between the advancement of women in the workplace and their sexual behavior stubbornly persist in our society.").

**50.** *See, e.g., Barnes v. Costle,* 183 U.S.App.D.C. 90, 561 F.2d 983, 989–90 (1977).

**51.** *See* 19 *Del. C.* § 711(a).

**52.** *See Doe v. City of Belleville, Illinois,* 119 F.3d 563 (7th Cir.1997) ("The familiar notion is thus that a man sexually harassed by a man may claim discrimination under Title VII be-cause the harasser is, presumably, heterosexual and would not have bothered her if she were a man."); *see also Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 79, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) ("Courts and juries have found the inference of discrimination easy to draw in most male-female sexual harassment situations, because the challenged conduct typically involves explicit or implicit proposals of sexual activity; it is reasonable to assume those proposals would not have been made to someone of the same sex.").

a female employee and a male employee because they were the best-qualified. All three attend and do their jobs, without any personal interaction of the sexual variety. But when he comes home, Mrs. Zarif questions him closely and insinuates that he took the female employee along for improper reasons. The next year Dr. Zarif takes two different employees, one of whom is also female, and does so on the basis of merit. Like the previous year, Dr. Zarif and the employees are all work, and no sexual play. But once again, Mrs. Zarif rips him up about his supposed infidelity with the female employee at the conference. To get her off his case, Dr. Zarif promises her he will never take another female employee to the conference. In the third year, therefore, Dr. Zarif takes two male employees, so as to avoid the wrath of his wife, and passes over equally or more qualified female employees. In this scenario, it is difficult to see how a claim of sexual discrimination would not exist. But in Mrs. Holland's case, the Department argues that the more extreme act of discharge does not support a claim under the Act, simply because other women still work for Dr. Zarif. The other women, however, arguably face the threat of similar treatment in the future, and may

well be denied employment opportunities by Dr. Zarif that would be available to them if *they were men and therefore unlikely to arouse his wife's jealousy.*

Finally, the Department may wish to consider the decisions of the federal courts in arguably analogous cases. There is no doubt that this case presents a factual context far different from the classic case of sex discrimination, in which a woman is denied access to a particular position on the ground that her employer does not believe that a woman could or should perform such a job. The federal courts have taken differing positions on cases analogous to this, where employment decisions are bound up in the complicated interpersonal dynamics of relations between the sexes. Some courts have been more willing to see employment action based on these inter-personal dynamics as involving sex discrimination than others.[53] It would be helpful if the Department, as the agency charged on a day-to-day basis with implementing the Act, provided its views on the best choice for Delaware.

## IV. *Conclusion*

For the foregoing reasons, the defendants' motion to dismiss is Denied. IT IS

---

**53.** For example, the federal courts have grappled with the question whether it is sex discrimination for an employer to give preferential treatment to a subordinate who is his lover in making promotional decisions. Some courts have found that it is not. *DeCintio v. Westchester Med. Center,* 807 F.2d 304 (2d Cir.1986); *see also Platner v. Cash & Thomas Contractors, Inc.,* 908 F.2d 902 (11th Cir.1990) (where proprietor fired female employee who was doing satisfactory work to help preserve the marriage of his son, who was also an employee, and whose wife suspected that the plaintiff and the son were having an affair, court found that no sex discrimination had occurred, simply nepotism). Others have taken the view that it could be. *See King v. Palmer,* 778 F.2d 878

(D.C.Cir.1985), *abrogated on other grounds by St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *see also Spain,* 26 F.3d 439 (deploying similar reasoning in case where a woman alleged sexual discrimination because of workplace rumors that she was having an affair with her supervisor). Commentators have noted that if a supervisor prefers his lover to others, this will create a disparate impact on the sex the supervisor does not prefer for sexual purposes and suggest to that submission to the supervisor's sexual advances is necessary or desirable as a route to professional advancement. *See generally* Mary C. Manemann, *The Meaning Of 'Sex' In Title VII: Is Favoring an Employee Lover a Violation of the Act?,* 83 NW. U.L. REV. 612 (1989).

SO ORDERED. The parties shall schedule an office conference, to occur within ten days, to discuss the procession of this case.[54]

■

**54.** The other motion the court must briefly address is Mrs. Holland's motion to file a second amended complaint. In the proposed complaint, Mrs. Holland sets forth additional claims against the Department, Ms. Wheedleton, and Dr. Zarif. The proposed complaint also adds Mrs. Zarif as a defendant. As to the Department and Wheedleton, the amendment sets forth allegations that the manner in which the Department processed Mrs. Holland's claim deprived her of a property right without due process of law. In addition, the complaint alleges that the Department handles discrimination claims so haphazardly as to discriminate between claimants on an irrational basis, thereby depriving claimants, in particular Mrs. Holland, of equal protection of the law.

As to Dr. Zarif, the core of the amended complaint is Mrs. Holland's pleading of a breach of contract claim against Dr. Zarif. That count alleges that Dr. Zarif breached the implied covenant of good faith and fair dealing by terminating Mrs. Holland because of her sex. Because this state's public policy disfavors sex discrimination, Mrs. Holland contends that the at-will employment doctrine does not bar her action, under the reasoning of *Schuster v. Derocili*, Del.Supr., 775 A.2d 1029 (2001). In *Schuster*, a plaintiff whose sexual harassment claim under the Act was dismissed was permitted to bring a common law breach of contract action based on the same alleged acts of harassment the Department had found were unsubstantiated.

Mrs. Holland has also brought a claim of tortious interference with contract against Mrs. Zarif for inducing the alleged breach. Relatedly, Mrs. Holland claims that Mrs. Zarif's accusations of immoral conduct were made in the presence of other employees of Dr. Zarif and were defamatory *per se*, and seeks among other things an injunction against further similar statements. Mrs. Holland has also set forth a count of tortious interference with legal process and intentional infliction of emotional distress. The basis for this count is that Dr. Zarif threatened to make sure that Mrs. Holland never worked in the health care field again if she hired counsel to file suit against him.

Dr. Zarif and Mrs. Zarif opposed the motion to amend in a letter submission solely on the grounds that the amended complaint fails to state claims cognizable in a court of equity. Meanwhile, the Department has been content to rest on the arguments made in its previous motion to dismiss and not to address the proposed amended complaint specifically.

Given the failure of the defendants to argue that proposed amended complaint states cognizable claims and having concluded that the proposed amended complaint also states a claim in equity, I grant Mrs. Holland's motion to amend. Of course, once the status of her claims under the Act become clear, it may be that the issue of where this suit should proceed should be revisited, upon the filing of a formal motion and brief by the defendants.